**RECORD NO. 21-4333**

In The

# United States Court Of Appeals
# For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## MARVARLUS CORTEL SNEAD,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT WILMINGTON**

————————

**BRIEF OF APPELLANT**

————————

**Paul A. Tharp**
ARNOLD & SMITH, PLLC
**200 North McDowell Street**
**Charlotte, NC 28204**
**(704) 370-2828**

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES.................................................................................... iv

STATEMENT OF JURISDICTION ........................................................................ 1

ISSUES POSED BY SNEAD'S APPEAL............................................................... 1

STATEMENT OF THE CASE ................................................................................ 2

      Statement of the Facts ................................................................................. 3

SUMMARY OF DEFENDANT SNEAD'S ARGUMENT ................................... 14

ARGUMENT ........................................................................................................ 15

   I.    The District Court erred when it denied Snead's Motion
for Judgment of Acquittal on Counts III and IV ......................... 15

       STANDARD OF REVIEW ................................................................ 15

       DISCUSSION ..................................................................................... 16

          A.    A rational trier of fact could not conclude that
Snead engaged in sex trafficking of a minor ........... 16

          B.    A rational trier of fact could not conclude that
Snead traveled in interstate commerce or used
a facility of interstate commerce with the
intent to promote, manage, establish, carry on,
or facilitate the promotion, management, or
carrying on of a business enterprise involving
prostitution ................................................................. 23

i

II.   The presentation of irrelevant and prejudicial evidence of unrelated conduct attributed to Snead served to violate his right to due process of law in the manner and conduct of his trial. ........................................................................25

     STANDARD OF REVIEW – Plain Error, Joinder .......................25

     DISCUSSION ....................................................................27

     STANDARD OF REVIEW, Other Crimes....................................30

     DISCUSSION ....................................................................30

III.   The District Court abused its discretion by allowing testimony of an expert witness which was irrelevant and concerned information within the common knowledge of jurors, and which enabled the jury to convict Snead under a statute which is both unconstitutionally vague and overbroad........................................................................35

     STANDARD OF REVIEW...............................................35

     DISCUSSION ....................................................................35

     STANDARD OF REVIEW, Vagueness, Overbreadth................40

     DISCUSSION ....................................................................40

IV.   The District Court abused its discretion when it ordered Snead to pay $202,743.35 in restitution .........................................48

     STANDARD OF REVIEW...............................................48

     DISCUSSION ....................................................................48

V.    The District Court abused its discretion when it sentenced
      Snead to serve 420 months on Count III and 60 months on
      Count IV ............................................................................................52

      STANDARD OF REVIEW .................................................................52

      DISCUSSION ......................................................................................52

CONCLUSION ...........................................................................................58

CERTIFICATE OF COMPLIANCE .....................................................60

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Bruton v. United States*,
    391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) ........................ 26-27

*City of Chicago v. Morales*,
    527 U.S. 41, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) ............................... 42

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ............................................................................... 37

*Doe v. Cooper*,
    842 F.3d 833 (4th Cir. 2016) ................................................................. 41

*Farrell v. Burke*,
    449 F.3d 470 (2d Cir. 2006) .................................................................. 45

*Gall v. United States*,
    552 U.S. 38 (2007) ......................................................................... 52, 56

*Holder v. Humanitarian Law Project*,
    561 U.S. 1, 130 S. Ct. 2705, 177 L. Ed. 2d 355 (2010) .............................. 44

*Hormel v. Helvering*,
    312 U.S. 552, 61 S. Ct. 719, 85 L. Ed. 1037 (1941) .................................... 41

*In re Sealed Case*,
    702 F.3d 59 (D.C. Cir. 2012) .......................................................... 49, 50

*Kolender v. Lawson*,
    461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) ....................... 41, 42

*Lanzetta v. New Jersey*,
    306 U.S. 451, 59 S. Ct. 618, 83 L. Ed. 888 (1939) ...................................... 42

*Manning v. Caldwell for City of Roanoke,*
    930 F.3d 264 (4th Cir. 2019)........................................................ 40-41, 42

*Martin v. Lloyd,*
    700 F.3d 132 (4th Cir. 2012)........................................................41

*N.Y. State Club Ass'n, Inc. v. City of New York,*
    487 U.S. 1, 108 S. Ct. 2225, 101 L. Ed. 2d 1 (1988) ...........................46, 47

*Papachristou v. City of Jacksonville,*
    405 U.S. 156, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972) ................................41

*Singleton v. Wulff,*
    428 U.S. 106, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976) ...............................41

*United States v. Abdush-Shakur,*
    465 F.3d 458 (10th Cir. 2006)........................................................38

*United States v. Amawi,*
    695 F.3d 457 (6th Cir. 2012)........................................................38

*United States v. Anderson,*
    851 F.2d 384 (D.C. Cir. 1988) ........................................................38

*United States v. Barlow,*
    568 F.3d 215 (5th Cir. 2009)........................................................19

*United States v. Baston,*
    818 F.3d 651 (11th Cir. 2016)........................................................50

*United States v. Blue,*
    877 F.3d 513 (4th Cir. 2017)........................................................57

*United States v. Bostick,*
    791 F.3d 127 (D.C. Cir. 2015) ........................................................38

*United States v. Caldwell,*
    760 F.3d 267 (3d Cir. 2014)........................................................34

*United States v. Cardwell*,
    433 F.3d 378 (4th Cir. 2005)................................................................26, 30

*United States v. Chapman*,
    589 F. App'x 159 (4th Cir. 2015) ...................................................16, 17, 23

*United States v. Chin*,
    83 F.3d 83 (4th Cir. 1996)..............................................................................33

*United States v. Comer*,
    5 F.4th 535 (2021) ...........................................................................................40

*United States v. Cook*,
    782 F.3d 983 (8th Cir. 2015)..........................................................................44

*United States v. Crisp*,
    324 F.3d 261 (4th Cir. 2003)..........................................................................37

*United States v. D'Ambrosio*,
    1:15-CR-3 (M.D. Pa. April 7, 2016)..............................................................40

*United States v. Delgado*,
    677 Fed. Appx. 85 (3d Cir. 2017).............................................................38, 40

*United States v. Foutz*,
    540 F.2d 733 (4th Cir. 1976)......................................................................27, 30

*United States v. Fuertes*,
    805 F.3d 485 (4th Cir. 2015)..........................................................................35

*United States v. Garcia-Gonzalez*,
    714 F.3d 306 (5th Cir. 2013)..........................................................................16

*United States v. Hall*,
    858 F.3d 254 (4th Cir. 2017)..........................................................................34

*United States v. Hawkins*,
    776 F.3d 200 (4th Cir. 2015)..........................................................................29

*United States v. Helton*,
     782 F.3d 148 (4th Cir. 2015)....................................................57

*United States v. Holloway*,
     1 F.3d 307 (5th Cir. 1993)......................................................30

*United States v. Jennings*,
     860 Fed. Appx. 287 (4th Cir. 2021)..................................15, 40

*United States v. Johnson*,
     617 F.3d 286 (4th Cir. 2010)....................................................33

*United States v. Kidd*,
     385 F. Supp. 3d 259 (S.D.N.Y. July 1, 2019) ............................40

*United States v. King*,
     Cr. No. 09-2007 (D. Haw. March 17, 2010) ..............................40

*United States v. King*,
     703 F. Supp. 2d 1063 (D. Haw. 2010)........................................38

*United States v. Lane*,
     474 U.S. 438, 106 S. Ct. 725, 88 L. Ed. 2d 814 (1986) ................26

*United States v. Lynn*,
     592 F.3d 572 (4th Cir. 2010)....................................................57

*United States v. Lynn*,
     856 F.2d 430 (1st Cir. 1988) ....................................................33

*United States v. Mackins*,
     315 F.3d 399 (4th Cir. 2003)....................................................26

*United States v. McBride*,
     676 F.3d 385 (4th Cir. 2012)....................................................33

*United States v. Monu*,
     782 F.2d 1209 (4th Cir. 1986)..................................................24

*United States v. Ocasio*,
    750 F.3d 399 (4th Cir. 2014)........................................................49

*United States v. Olano*,
    507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) ...........................25

*United States v. Queen*,
    132 F.3d 991 (4th Cir. 1997)..................................................32, 33

*United States v. Randazzo*,
    80 F.3d 623 (1st Cir. 1996) ............................................................26

*United States v. Richardson*,
    61 F.3d 728 (D.C. Cir. 1998) ........................................................26

*United States v. Ritchie*,
    858 F.3d 201 (4th Cir. 2017)........................................................48

*United States v. Rodriguez-Soriano*,
    931 F.3d 281 (4th Cir. 2019)........................................................15

*United States v. Sadler*,
    789 Fed. Appx. 952 (4th Cir. 2019)..............................................50

*United States v. Savage*,
    885 F.3d 212 (4th Cir. 2018)........................................................15

*United States v. Shamsud-Din*,
    10-CR-927 (N.D. Ill. Jan. 31, 2012)..............................................40

*United States v. Smith*,
    472 F.3d 222 (4th Cir. 2006)........................................................58

*United States v. Steele*,
    897 F.3d 606 (4th Cir. 2018)..................................................48, 49

*United States v. Thompson*,
    896 F.3d 155 (2d Cir. 2018)..................................................43, 45, 46, 48

*United States v. Vinson*,
    852 F.3d 333 (4th Cir. 2017)................................................56, 57

*United States v. Warren*,
    744 Fed. Appx. 778 (4th Cir. 2019)....................................39

*United States v. Williams*,
    05-CR-443 (M.D. Pa. Oct. 19, 2007).................................40

*United States v. Williams*,
    319 F. Supp. 812 (E.D. Va. June 8, 2018) .........................50

*United States v. Williams*,
    553 U.S. 285, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008) ..............44, 46, 48

*Virginia v. Hicks*,
    539 U.S. 113, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003) ..........................45

*Wash. Gas Light Co. v. Va. Elec. & Power Co.*,
    438 F.2d 248 (4th Cir. 1971)..............................................41

**Statutes:**

18 U.S.C. § 2 .........................................................................2, 4

18 U.S.C. § 1029(a)(1) .........................................................1

18 U.S.C. § 1029(a)(2) .........................................................1

18 U.S.C. § 1029(a)(3) .........................................................1

18 U.S.C. § 1591 ...........................................................*passim*

18 U.S.C. § 1591(a)(1) .........................................2, 4, 16, 53

18 U.S.C. § 1591(b)(2) .......................................................2, 4

18 U.S.C. §§ 1591(b)(2)-(5) ................................................44

18 U.S.C. § 1591(c) ..............................................................16

18 U.S.C. § 1593 ................................................................................49

18 U.S.C. § 1593(b)(1) ........................................................................51

18 U.S.C. § 1593(b)(3) ....................................................................49, 51

18 U.S.C. § 1952(a)(3) ........................................................................2, 4

18 U.S.C. § 1952(b)(1) ..........................................................................24

18 U.S.C. § 2251 ..................................................................................56

18 U.S.C. § 2251(a) ............................................................................2, 3

18 U.S.C. § 2251(e) ............................................................................2, 3

18 U.S.C. § 2259(c)(2) ..........................................................................49

18 U.S.C. §§ 2259(c)(2)(A)–(B) ...........................................................49

18 U.S.C. § 2426(b)(1)(A) .....................................................................55

18 U.S.C. § 3231 ....................................................................................1

18 U.S.C. § 3553(a) ..........................................................52, 56, 57, 58

18 U.S.C. § 3742 ....................................................................................1

22 U.S.C. § 7101(b)(1) ..........................................................................43

22 U.S.C. § 7102(3) ..............................................................................45

28 U.S.C. § 1291 ....................................................................................1

N.C. Gen. Stat. § 14-27.23 ...................................................................28

N.C. Gen. Stat. § 14-27.24 ...................................................................28

N.C. Gen. Stat. § 14-27.25 ...................................................................28

N.C. Gen. Stat. § 14-27.28 ...................................................................28

N.C. Gen. Stat. § 14-27.29 ...................................................28

N.C. Gen. Stat. § 14-27.30 ...................................................28

N.C. Gen. Stat. § 14-202.1 ...................................................28

N.C. Gen. Stat. § 14-202.2 ...................................................28

**Constitutional Provisions:**

U.S. Const. amend. I ...........................................................45

U.S. Const. amend. V ..........................................................41

U.S. Const. amend. XIV ......................................................41

**Sentencing Guidelines:**

U.S.S.G. § 2G1.3 .................................................................53

U.S.S.G. § 2G1.3(b)(2) ....................................................53, 54

U.S.S.G. § 2G1.3(b)(2)(B) .................................................53

U.S.S.G. § 3C1.1 ..........................................................54, 55

U.S.S.G. § 4B1.5 ................................................................55

U.S.S.G. § 4B1.5(b) ...........................................................55

U.S.S.G. § 4B1.5(b)(1) .......................................................56

**Rules:**

Fed. R. App. P. 4(b)(1) .........................................................1

Fed. R. Crim. P. 52(b) ........................................................25

Fed. R. Evid. 403 ...............................................................30

Fed. R. Evid. 404 ...............................................................32

Fed. R. Evid. 404(a)(1) ..................................................................30

Fed. R. Evid. 404(b) ..........................................................30, 33, 34

Fed. R. Evid. 702 ...........................................................................37

# STATEMENT OF JURISDICTION

This is an appeal from a criminal case from the Eastern District of North Carolina. The District Court had original jurisdiction pursuant to 18 U.S.C. §§ 1029(a)(1), (a)(2), and (a)(3), and 18 U.S.C. § 3231, as the government charged the Defendant with offenses against the United States of America. J.A. at 83. The Court of Appeals has jurisdiction over this appeal pursuant to 18 U.S.C. § 3742, 28 U.S.C. § 1291, and Fed. R. App. P. 4(b)(1).

## ISSUES POSED BY SNEAD'S APPEAL

**I. Did the District Court err when it denied Snead's Motion for Judgment of Acquittal on Counts III and IV?**

**II. Did the presentation of irrelevant and prejudicial evidence of unrelated conduct attributed to Snead serve to violate his right to due process of law in the manner and conduct of his trial?**

**III. Did the District Court abuse its discretion in allowing testimony of an expert witness which was irrelevant and concerned information within the common knowledge of jurors, and which enabled the jury to convict Snead under a statute which is both unconstitutionally vague and overbroad?**

**IV. Did the District Court abuse its discretion when it ordered Snead to pay $202,743.35 in restitution?**

**V. Did the District Court abuse its discretion when it sentenced Snead to serve 420 months on Count III and 60 months on Count IV?**

## STATEMENT OF THE CASE

On September 25, 2019, the United States indicted Marvarlus Snead ("Snead") on one count of knowingly employing, using, persuading, inducing, enticing, and coercing a minor to engage in sexually explicit conduct "for the purpose of producing visual depictions of such conduct." J.A. at 23. The Government alleged that the materials "had been mailed, shipped, and transported in interstate and foreign commerce… in violation of" 18 U.S.C. § 2251(a) and (e). The Government also charged Snead with knowingly traveling or using a facility in interstate commerce, "namely the Internet," to carry on a prostitution business in violation of 18 U.S.C. § 1952(a)(3) and 2.

On February 26, 2021, the United States indicted Snead and in a four-count superseding indictment alleging in Count One that Snead engaged a minor in the production of a visual depiction of sexually explicit conduct in violation of 18 U.S.C. §§ 2251(a) and (e); in Count Two that Snead possessed a visual depiction of sexually explicit conduct involving a minor in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(2); in Count Three that Snead trafficked a minor in prostitution in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(2); and in Count Four that Snead used a facility in interstate commerce to carry on an unlawful activity in violation of 18 U.S.C. §§ 1952(a)(3) and 2. J.A. at 83.

2

The Court dismissed Count Two on December 7, 2020. J.A. at 115. On December 17, 2020, after a trial, a jury found Snead guilty on Counts One, Three and Four. J.A. at 1098-99. On December 31, 2020, Snead filed a Motion for Judgment of Acquittal or, in the alternative, a Motion for New Trial. J.A. at 1100. The Court denied Snead's motion for Judgment of Acquittal, but it granted Snead's motion for new trial on Count One on May 6, 2021. J.A. at 1214.

On June 21, 2021, the Court sentenced Snead to serve four hundred and twenty (420) months in prison on Count Three and sixty (60) months on Count Four, the sentences to run concurrently. J.A. at 1267, ¶¶ 9-12. The Court ordered Sneed to pay restitution to a government witness in the amount of two-hundred and two thousand, seven-hundred and forty-three dollars and thirty-five cents. ($202,743.35). J.A. at 1271 ¶¶ 18-19.

## Statement of the Facts

On February 26, 2021, the United States indicted Snead and in a four-count superseding indictment alleging in Count One that Snead engaged a minor in the production of a visual depiction of sexually explicit conduct in violation of 18 U.S.C. §§ 2251(a) and (e); in Count Two that Snead possessed a visual depiction of sexually explicit conduct involving a minor in violation

3

of 18 U.S.C. §§ 1591(a)(1) and (b)(2); in Count Three that Snead trafficked a

minor in prostitution in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(2); and in

Count Four that Snead used a facility in interstate commerce to carry on an

unlawful activity in violation of 18 U.S.C. §§ 1952(a)(3) and 2. J.A. at 83.

The Court dismissed Count Two on December 7, 2020. J.A. at 115; 314.

At Snead's trial, the Government presented evidence that in August

and September 2017, Snead helped Jane Doe find a safe place to live. J.A. at

859, ¶¶ 3-5. Snead asked his longtime friend, Adam Smith, if Jane could stay

at Smith's house in Newton Grove. J.A. at 853 ¶ 2; 860, ¶¶ 4-7. Smith lived

with his girlfriend and her two-year-old son. J.A. at 859, ¶¶ 12-13. After a

few weeks in Newton Grove, Jane Doe returned to live with her family in

Benson. J.A. at 627 ¶ 3; 860. Smith said at the time, Snead had never been

involved in escorting. J.A. at 862.

CT was twenty-five (25) years-old when she began dating Snead on

December 14, 2017. J.A. at 537-38; 595, ¶¶ 7-10. Around December 25, 2017,

CT messaged Snead on *Facebook* saying "Me too, king. Let's build up this

empire… We can live lavish, and our children will always eat." J.A. at 599,

¶¶ 24-25; 600, ¶¶ 7-8. She explained:

At that point I had -- I was trying to find any way to make money, whether it would be to sell drugs or to try to find a job. But I was having such a hard time finding a job that I was trying to do like pretty much anything just to get money.

J.A. at 601, ¶¶ 18-22.

A few days later, CT texted Snead saying "We got this, daddy. Time to set them by appointment and no downtime but to sleep, eat, and pee… Come on, daddy, help me. Help us get this money. And then a bunch of money bags." J.A. at 604, ¶¶ 17-19; 605, ¶¶ 16-17.

At the time, Snead had known Ashanti McLean, a female who was formerly a male named "Joshua," for five years. J.A. at 752, ¶ 24; 753; 759, ¶¶ 1-3. McLean, now in her late twenties, had begun working as an escort ten years earlier at age sixteen (16). J.A. at 760, ¶¶ 13-16. McLean made a living for a decade through escorting services that sometimes included sex; other times services featured companionship, conversation, or dinner. J.A. at 811, ¶¶ 13-15; 812, ¶¶ 5-8.

McLean said Snead was not involved in escorting during the five years she knew him. J.A. at 813. When CT asked Snead about it, Snead asked McLean how escorting worked, and McLean told Snead about *Backpage.com*. J.A. at 814. McLean suggested prices to Snead and taught him the meaning

of basic terminology. J.A. at 815-17. Finally, Snead texted McLean pictures of CT and said she was interested in escorting. J.A. at 765-66; 822, ¶¶ 2-6. He bragged that CT was "down for whatever as long as I F her." J.A. at 766 ¶ 9.

McLean used her own account on *Backpage.com* to post an advertisement for CT. J.A. at 767, ¶¶ 1-12. McLean taught CT what to do and say and how to post her own ads. J.A. at 774, ¶¶ 5-8. McLean used photographs that CT had sent to Snead. J.A. at 540, ¶¶ 17-20; ¶ 24. McLean paid for the ads. J.A. at 767, ¶¶ 19-20. CT said after McLean trained her, she went on escort dates in Raleigh around December 27, 2017. J.A. at 541, ¶¶ 21-23; 542, ¶¶ 8-14; 605, ¶¶ 20-23; 613, ¶¶ 1-5. CT and McLean both booked and paid for hotel rooms. J.A. at 547, ¶¶ 23-25; 774, ¶ 13.

CT said she stayed at Adam Smith's house in Newton Grove a few times. J.A. at 548, ¶¶ 11-24; 549. She said Smith allowed Snead to come and go as he pleased, as long as Snead gave Smith drugs. J.A. at 549, ¶¶ 20-23. Smith said Snead and CT were a dating couple. J.A. 864, ¶¶ 4-5.

McLean accompanied Snead and CT on a trip to Jacksonville, where Snead and CT had their own room. J.A. at 777, ¶¶ 4-5. McLean also described the pair as a couple. J.A. at 822. McLean did not go on any other trips with Snead and CT. J.A. at 777, ¶ 14.

McLean controlled CT's *Backpage.com* page. J.A. at 553, ¶ 8. CT wrote on January 7, 2018, that she believed she could make money on her own. J.A. at 554, ¶¶ 1-2. She asked McLean to put up a *Backpage.com* advertisement in Wilmington and discussed in a *Facebook* chat going to Wilmington without Snead to make money. J.A. at 606, ¶¶ 19-25; 607, ¶¶ 1-4. CT then went to Wilmington to go on dates by herself. J.A. at 558, ¶¶ 5-8. "More money is the goal," CT wrote. "Money, money, money, money." J.A. at 610, ¶¶ 16-17. After that, McLean told Snead he needed "to find another girl… [s]o he can have more income coming in." J.A. at 781, ¶¶ 18-20.

Jane Doe said she knew Snead and his family growing up. J.A. at 629 ¶¶ 8-9. After she was physically abused by a man in August 2017, Jane asked Snead for help, and Snead picked her up and arranged for her to stay with Smith. J.A. at 633, ¶¶ 16-19; 634, ¶¶ 2-4; 697, ¶¶ 4-25. Jane said Snead bragged that he could help her make money, and she told the jury he was a drug dealer. J.A. at 635, ¶¶ 20-21; 636, ¶ 16.

After Jane messaged Snead in early 2018, McLean came and picked her up from Benson and, after riding to Wilmington, Jane said McLean introduced her to men with whom she engaged in sexual acts for money. J.A. at 642, ¶¶ 13-17; 643, ¶¶ 5-18; ¶¶ 21-25; 645, ¶ 1, ¶ 13; 788. McLean paid

for Jane's *Backpage.com* ads. J.A. at 797, ¶¶ 5-6. Snead warned McLean that Jane was "young as F[,]" but according to McLean he meant "she looked very, very young." J.A. at 783, ¶ 12-15. In a *Facebook* conversation with McLean, Snead said "[s]he ain't but 18. She'll be 19 February 9th." J.A. at 791, ¶¶ 5-6. McLean said she asked Jane how old she was, and Jane told her she was already nineteen. *Id.* at ¶¶ 14-21. When CT met Jane around January 13, 2018, Jane said she was twenty-two (22) years old. J.A. at 563, ¶ 8; 613, ¶¶ 11-13.

Jane said at some point Snead asked her how old she was and asked her the date of her birthday. J.A. at 638, ¶¶ 23-25. The Court admitted the Government's Exhibit 15, Jane's birth certificate, which displayed her date of birth. J.A. at 626, ¶¶ 9-19. Smith said at some point Snead and Jane stayed at his house together. J.A. at 868, ¶¶ 15-16. He said Snead and Jane were dating. *Id.* Smith said he thought Jane was seventeen (17), because Snead asked if Smith could cash Jane's benefits check, which she could not do herself because she was a minor. J.A. at 861, ¶¶ 6-13; 870, ¶ 2. Jane, however, testified that the reason she could not accomplish simple tasks on her own behalf was because her aunt, who possessed her "ID, a birth certificate, a social… would not release [her] documents." J.A. at 635, ¶¶ 8-14.

8

The Court admitted the Government's Exhibits 45 and 85, text messages between Jane and Snead in which Jane wrote: "Facts. I'm bored. LOL. Y'all keep me rolling." Snead wrote back: "We need another female but she has to be at least 18. Your birthday can't get here fast enough." J.A. at 667, ¶¶ 6-12; 668, ¶¶ 5-6.

Snead and Jane traveled to Jacksonville; McLean did not go. J.A. at 793. Snead wrote McLean saying "first on the way, five more coming in Jacksonville." J.A. at 795, ¶¶ 18-20. However, early the next morning, CT called McLean crying, saying she felt unwanted. J.A. at 798, ¶¶ 4-7. CT became upset with Snead after finding him and Jane in bed together in a Jacksonville hotel room. J.A. at 572-73. McLean said before that, CT was Snead's "girlfriend." J.A. at 803. CT complained that Jane had not worked. *Id.* CT then tried to recruit Jane to go into business with her. J.A. at 575, ¶¶ 16-24. Jane declined, telling CT hers and Snead's relationship was about more than money. J.A. at 618, ¶¶ 3-4.

CT dropped Jane and Snead off at a McDonald's in Jacksonville, where McLean picked them up. J.A. at 800, ¶¶ 2-12. McLean rented rooms at the TownPlace Suites. J.A. at 801, ¶¶ 5-15. McLean said she was in one room, and Snead and Jane were in another. J.A. at 802, ¶¶ 23-24. McLean described Snead's and Jane's interactions as those of a "couple." J.A. at 803, ¶ 5.

A few days later, in Wilmington, Detective William Campbell of the New Hanover County, North Carolina sheriff's office engaged in an undercover "sting." J.A. at 473 ¶¶ 16-17; 476, ¶¶ 10-12. Detective Laura Johnson said "Detective Parker" set up a "date" by text message with a woman featured on *Backpage.com* and went to Room 306 at the Residence Inn. J.A. at 516, ¶¶ 15-16; 518, ¶¶ 3-10; ¶¶ 20-21; 531, ¶¶ 9-12; ¶ 16. As he entered the room, a black male exited and walked down the steps to the bottom floor, exited the back door of the hotel, and went to a vehicle. *Id.* Johnson identified Snead as the black male, and said officers detained him. J.A. at 519, ¶¶ 15-25.

Johnson said officers found Jane and McLean in Room 306, and the Court admitted the Government's Exhibits 51, 52, 53, 59, 61, and 62, photographs of the room. J.A. at 520, ¶ 12; 521, ¶¶ 15-24; 522; 523-24; 525, ¶¶ 2-6; ¶¶ 9-10; ¶¶ 16-17. Campbell said "officers on the scene did some preliminary investigations and realized that one of three individuals[1] detained on the scene was seventeen (17) years old." J.A. at 479, ¶¶ 13-16. Johnson said Jane told her that Snead and

---

[1] The District Court admitted the Governments Exhibits 97, 99, and 102 depicting the three detained individuals: Defendant, Ashanti McLean, and Jane Doe. J.A. at 480.

10

McLean did not know what she had been doing, and they were not aware of her age. J.A. at 530, ¶¶ 15-24. At trial, Jane confirmed that she told investigators that Snead and McLean did not know her true age. J.A. at 737, ¶¶ 21-24.

Campbell seized four cellular telephones and a laptop computer. J.A. at 487, ¶¶ 4-5. He interviewed the three detainees, including Snead, and the Court admitted four clips of Snead speaking[2]. J.A. at 490, ¶¶ 14-15; 491. The Government used the clips to establish Snead's ownership of a seized iPhone. J.A. at 491, ¶¶ 9-10; ¶¶ 16-18; 492, ¶ 4.

Through Campbell, the Government admitted Exhibit 112, photos of Snead's hands; Exhibit 113, a photo of Snead's torso, stomach, and the red Ralph Lauren boxers he wore. J.A. at 492, ¶ 9; ¶¶ 11-12; 493, ¶¶ 1-3; ¶¶ 11-12. Campbell said he requested records from *Backpage.com* relating to phone numbers of seized phones and an identification number associated with an advertisement posted on the site. J.A. at 495, ¶¶ 1-10. The Court admitted four exhibits (the Government's Exhibits 16, 17, 18, and 19) depicting two females—Jane Doe, and CT—and a certificate of authenticity from *Backpage.com*. (Exhibit 20). J.A. at 495, ¶¶ 19-25; 496.

---

[2] Government's Exhibit 90.

Citing data from *Backpage.com*, Campbell said McLean created the advertisement shown in Exhibit 18 on January 12, 2018, paying two-dollars to post it on January 12 and two-dollars to repost on January 23. J.A. at 497, ¶¶ 23-24.. J.A. at 498, ¶¶ 12-18. Only McLean's phone number and email address were associated with ad. J.A. at 499, ¶¶ 14-22. The Court admitted a photograph of CT and a *Backpage.com* advertisement from the Raleigh-Durham area associated with McLean's phone number and email address. (Exhibit 101). J.A. at 501, ¶ 15; 502, ¶¶ 14-16.

Campbell obtained records from Snead's and Jane Doe's *Facebook* pages, and the Court admitted a certificate of authenticity from *Facebook*. (Exhibit 43). J.A. at 502, ¶¶ 20-21; 504. Campbell obtained hotel records including the Government's Exhibit 63, a hotel receipt, and Exhibit 64, a certificate of authenticity from a hotel manager, both of which the Court admitted. J.A. at 504, ¶¶ 5-8; 505. The exhibits showed that McLean rented hotel rooms in Jacksonville and Wilmington. J.A. at 505, ¶ 2; 506, ¶ 2.

Jane Doe said that after Snead's arrest, Snead's mother took her to get her birth certificate and social security card, fed her, and provided her housing. J.A. at 678, ¶¶ 19-25; 679, ¶¶ 1-11. The Court admitted two affidavits—one dated February 12, 2018 and another from January 17,

12

2019—in which Jane exonerated Snead from any wrongdoing, however she testified that Snead's mother actually wrote the affidavits and pressured her to sign them. J.A. at 676, ¶¶ 4-19; ¶¶ 20-25; 677, ¶ 1-6; ¶ 15; ¶¶ 22-23; 680, ¶¶ 23-25; 681, ¶¶ 1-8; ¶¶ 18-25; 682, ¶¶ 4-14; 685, ¶¶ 11-25; 725, ¶¶ 1-22.

McLean claimed that she received no money for any escort services performed by CT or Jane. J.A. at 775, ¶¶ 1-2; 796, ¶¶ 19-20. McLean pled guilty to state and federal charges and agreed to testify against Snead. J.A. at 756, ¶¶ 6-19; 757, ¶ 7; ¶¶ 19-21; 758, ¶¶ 16-18. McLean faced 2,566 months on her state charges, but after the plea, she expects to serve eight years in prison. J.A. at 835. McLean pled guilty to a federal charge, but she expects cooperation to render any federal penalty concurrent with her state sentence. J.A. at 837, ¶¶ 1-7; ¶¶ 13-18.

On December 17, 2020, a jury found Snead guilty on Counts One, Three and Four. J.A. at 1098. On December 31, 2020, Snead filed a Motion for Judgment of Acquittal or, in the alternative, a Motion for New Trial. J.A. at 1100. The Court denied Snead's motion for Judgment of Acquittal, but it granted Snead's motion for new trial on Count One on May 6, 2021. J.A. at 1214.

13

On June 21, 2021, the Court sentenced Snead to serve four hundred and twenty (420) months in prison on Count Three and sixty (60) months on Count Four, the sentences to run concurrently. J.A. at 1267, ¶¶ 9-12. The Court ordered Sneed to pay restitution to one of the Government's witnesses in the amount of two-hundred and two thousand, seven-hundred and forty-three dollars and thirty-five cents. ($202,743.35). J.A. at 1271, ¶¶ 18-19.

Snead made timely appeal to this Court, seeking the vacating of the judgment of the District Court and his immediate release from detention or, in the alternative, a new trial.

## SUMMARY OF DEFENDANT SNEAD'S ARGUMENT

A rational trier of fact could not conclude that Snead engaged in sex trafficking of a minor, or that he traveled in interstate commerce or used a facility of interstate commerce with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, or carrying on of a business enterprise involving prostitution. The presentation of irrelevant and prejudicial evidence of unrelated conduct attributed to Snead served to violate his right to due process of law in the manner and conduct of his trial. The District Court abused its discretion by allowing testimony of an expert witness which was irrelevant and concerned information within the common

14

knowledge of jurors, and which enabled the jury to convict Snead under a

statute which is both unconstitutionally vague and overbroad. The District

Court abused its discretion when it ordered Snead to pay $202,743.35 in

restitution. Lastly, the district court abused its discretion when it sentenced

Snead to serve 420 months on Count III and 60 months on Count IV.

## ARGUMENT

**I.    The District Court erred when it denied Snead's Motion for Judgment of Acquittal on Counts III and IV.**

### *STANDARD OF REVIEW*

The denial of a motion for judgment of acquittal is reviewed *de novo*.

*United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018). In assessing the

sufficiency of the evidence, the Court of Appeals determines "whether there

is substantial evidence to support the convictions when viewed in the light

most favorable to the Government. *Id.* "Substantial evidence is evidence that

a reasonable finder of fact could accept as adequate and sufficient to support

a conclusion of a defendant's guilt beyond a reasonable doubt." *United States*

*v. Jennings*, 860 Fed. Appx. 287 (4th Cir. 2021) (*quoting United States v.*

*Rodriguez-Soriano*, 931 F.3d 281, 286 (4th Cir. 2019)).

## DISCUSSION

### A.    A rational trier of fact could not conclude that Snead engaged in sex trafficking of a minor.

No rational trier of fact could find that Snead engaged in sex-trafficking of a minor. In order to convict a defendant under 18 U.S.C. § 1591(a)(1), the government must prove that the defendant: "(1) knowingly recruited, transported, harbored, maintained, obtained, or enticed a person, (2) in or affecting interstate commerce, (3) knowing or in reckless disregard of the fact that the victim had not attained the age of eighteen years and would be made to engage in a commercial sex act." *United States v. Chapman*, 589 F. App'x 159, 160 (4th Cir. 2015) (citing *United States v. Garcia-Gonzalez*, 714 F.3d 306, 312 (5th Cir. 2013)). "In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained or maintained, the Government need not prove that the defendant knew that the person had not attained the age of 18 years." 18 U.S.C. § 1591(c). J.A. at 1072, ¶¶ 3-14.

Snead moved for judgment of acquittal on all counts at the close of evidence. J.A. at 973, ¶¶ 20-23. The United States failed to prove Snead (1)

knowingly recruited, transported, harbored, maintained, obtained, or enticed Jane Doe; (2) in or affecting interstate commerce; (3) [while] knowing or in reckless disregard of the fact that Jane had not attained the age of eighteen years and would be made to engage in a commercial sex act. *Chapman*, 589 F. App'x at 160.

First, Snead never *made* anyone do anything. He never engaged in physical violence. Jane Doe said Snead *rescued* her from domestic physical violence in August 2017 and provided her with safe housing. J.A. at 633, ¶¶ 16-19; 697, ¶¶ 4-25; 859, ¶¶ 3-5; 853, ¶ 2; 860, ¶¶ 4-7. Snead was no pimp. Those who knew him best—Adam Smith and Ashanti McLean—said Snead had never been involved in escorting. J.A. at 813; 861-62.

In December 2017, Snead began dating a 25-year-old named CT who was "trying to find any way to make money," and she bombarded Snead with messages saying "no downtime but to sleep, eat, and pee… Come on, daddy, help me. Help us get this money… "More money is the goal. Money, money, money, money." J.A. at 601, ¶¶ 18-22; 604, ¶¶ 17-19; 605, ¶¶ 16-17; 610, ¶¶ 16-17.

On December 25, 2017, CT messaged Snead about her desire to make money, telling him "king. Let's build up this empire… We can live lavish,

and our children will always eat." J.A. at 597, ¶¶ 4-7; 599, ¶¶ 24-25; 600, ¶¶ 7-8. As CT explained, "I was trying to find any way to make money… I was trying to do like pretty much anything just to get money." J.A. at 601, ¶¶ 18-22. She persisted, writing: "We got this, daddy. Time to set them by appointment and no downtime but to sleep, eat, and pee… Come on, daddy, help me. Help us get this money. And then a bunch of money bags."[3] J.A. at 604, ¶¶ 17-19; 605, ¶¶ 16-17.

Snead referred CT to his friend, Ashanti McLean, who "knew how to post ads" and trained CT at escorting. J.A. at 540, ¶¶ 17-20; ¶ 24; 541, ¶¶ 21-23. McLean had begun escorting a decade earlier and had made a living throughout her entire adult life as an escort. J.A. at 760, ¶ 13; ¶ 16. She had known Snead for five years and said he had never been involved in escorting. J.A. at 759, ¶¶ 1-3. McLean, unlike Snead, knew how to advertise on *Backpage.com*. J.A. at 814-15. McLean, not Snead, knew the prices to charge escort clients and the terminology used in the business. J.A. at 817.

---

[3] The Government's evidence showed Jane Doe was equally motivated to make money. She sent a message to Snead on January 21, 2018 saying "Facts. I'm bored. LOL. Y'all keep me rolling." J.A. at 667, ¶¶ 20-21; 668, ¶ 2. She also bragged to her friend "Little Gem" about the amount of money she made. J.A. at 707, ¶¶ 25; 708, ¶ 1.

McLean used her own preexisting *Backpage.com* account to post advertisements for CT. J.A. at 767, ¶¶ 1-12. McLean paid for the ads[4]. *Id.* at ¶¶ 19-20. McLean taught CT how to post her own ads. J.A. at 774, ¶¶ 5-8. She booked hotel rooms for CT, reserved in McLean's name. *Id.* at ¶ 13. While "it is beyond debate that the Internet and email are facilities or means of interstate commerce," *United States v. Barlow*, 568 F.3d 215, 220 (5th Cir.2009), Snead did not post or maintain the *Backpage.com* advertisements. The Government's evidence showed only McLean as associated with the *Backpage.com* advertisements. J.A. at 499, ¶¶ 14-22. Only McLean created the advertisements. J.A. at 497, ¶¶ 23-24. Only McLean paid for the advertisements. J.A. at 498, ¶¶ 12-18. Hotel records and receipts showed only McLean renting and paying for rooms. J.A. at 504, ¶¶ 5-8; 505; 5-6, ¶ 2. CT said "Ashanti [McLean] controlled my page." J.A. at 557, ¶ 8.

CT said she did not need a pimp. J.A. at 554, ¶¶ 1-2; 607, ¶¶ 1-4. While she claimed that Snead sat in her car during dates, she made this claim in the context of describing a trip she took to Wilmington *by herself*. J.A. at 561, ¶¶ 12-13. Snead did not travel to Wilmington with CT. J.A. at 558, ¶¶ 5-8.

---

[4] McLean said she also posted and paid for all of Jane Doe's advertisements. J.A. at 797, ¶¶ 5-6.

McLean, on the other hand, traveled to both Wilmington and Jacksonville with CT and stayed in rooms next to hers. J.A. at 615, ¶¶ 5-10; ¶¶ 17-22.

McLean said Snead and CT were "a couple" until Snead began dating Jane Doe. J.A. at 822, ¶¶ 2-6. After Snead rescued Jane from abuse in August, Jane returned to live with her aunt in Benson. J.A. at 635, ¶¶ 12-15. She stayed in touch with Snead, and after McLean told Snead to move on from CT, Snead told McLean to pick up Jane in Benson on January 11, 2018. J.A. at 635, ¶¶ 20-21; 781, ¶¶ 6-25; 783, ¶ 1. While Snead described Jane as being "young as F," he thought Jane Doe was an adult, writing to McLean that "She ain't but 18. She'll be 19 February 9th." J.A. at 783, ¶ 12; ¶ 15; 791, ¶¶ 5-6. McLean wrote back saying Jane said she was already nineteen (19). J.A. at 791, ¶¶ 14-21; J.A. at 826, ¶ 6.

McLean said Snead sent her a message a few days later from Jacksonville saying "first on the way, five more coming in Jacksonville." J.A. at 795, ¶¶ 18-20. However, McLean was not in Jacksonville, and she never received any money from Snead, Jane, or CT, thus she could not testify that Jane earned money providing escort services in Jacksonville. J.A. at 793; 796, ¶¶ 19-20. CT said she became angry in Jacksonville because Jane *did not* perform any services. J.A. at 573, ¶¶ 1-8; ¶¶ 21-23. McLean said Snead and Jane were "a couple." J.A.

at 803, ¶ 5; 809, ¶ 1. After a jealous CT found Snead and Jane in bed together, she dropped them off at a Jacksonville McDonald's and broke off her relationship with Snead. J.A. at 538, ¶¶ 13-14; 573, ¶¶ 1-8; ¶¶ 21-23. Jane's message to CT, telling her "Boo, me and boss bigger than a dollar[,]" suggested Jane viewed her relationship with Snead as dating, not coercion. J.A. at 618, ¶¶ 3-4.

The following week, Detective Laura Johnson said a man named "Detective Parker" set up a "date" with Jane Doe, a term that suggests Jane was "escorting" or providing what McLean described as companionship, conversation, dinner. J.A. at 531, ¶¶ 9-12; ¶ 16; 766, ¶ 1; 812, ¶¶ 5-8. After deputies detained Snead, McLean, and Jane in Wilmington, Johnson determined that Jane was seventeen.[5] J.A. at 527, ¶¶ 23-25.

Johnson testified that Jane told her Snead had no idea that she was booking dates, and Snead had no idea she was a few days under age eighteen (18). J.A. at 530, ¶¶ 15-24. Jane admitted that she told Wilmington deputies Snead and McLean did not know her true age. J.A. at 737, ¶¶ 21-24.

---

[5] The prosecutor, asking Johnson when she learned Jane's age, used the term "ID," however Jane Doe testified that her aunt had her identifying documents, and Jane did not obtain them until after Snead's arrest. J.A. at 635, ¶¶ 8-14; 678, ¶¶ 19-25; 679, ¶¶ 1-11. It is unclear how Johnson determined Jane's age.

CT said when she met Jane on January 13 and 14, 2018, Jane said she was 22. J.A. at 563, ¶ 8; 613, ¶¶ 11-13. CT recruited Jane to go into business with her. J.A. at 575, ¶¶ 16-24; 576, ¶¶ 4-11. CT would not have recruited Jane into business if she believed Jane was underage.

Jane acknowledged signing two affidavits, the first (Government's Exhibits 65 and 66) on February 12, 2018, and the second on January 17, 2019. J.A. at 676, ¶¶ 20-25; 677, ¶ 15; 678, ¶¶ 23-25; 679, ¶¶ 1-8. In these affidavits, Jane swore under oath that based on her own representations, Snead thought she was 20 or 21. J.A. at 681, ¶¶ 18-25.

Adam Smith testified that Snead asked him if he could cash Jane's "benefits check," claiming that Jane could not do so herself because she was underage. J.A. at 861, ¶¶ 6-13. Smith said he thought Jane Doe "was seventeen," however Smith by his own account was addicted to "Molly" and methamphetamine and "partied and did illegal drugs with" Jane at his residence, as he later admitted to federal agents. J.A. at 870, ¶ 2; 871; 882, ¶¶ 13-25; 883, ¶¶ 1-4. Smith suffered a near-fatal drug overdose on January 25, 2018. J.A. at 883, ¶¶ 18-24. His speculation regarding Jane's age is incongruous with his admitted partying and doing drugs with her; his memories of the time are clouded by a significant, near-fatal drug addiction. Jane, in contrast to

22

Smith's testimony, testified that she could not accomplish simple tasks on her own behalf because her aunt, who possessed her "ID, a birth certificate, a social… would not release [Jane's] documents." J.A. at 635, ¶¶ 8-14. Jane and therefore Snead never possessed documentary evidence showing Jane's age. Snead was always subject to Jane's misrepresentations about the fact.

A rational trier of fact could not conclude that Snead (1) knowingly recruited, transported, harbored, maintained, obtained, or enticed a person; (2) in or affecting interstate commerce; (3) knowing or in reckless disregard of the fact that the person had not attained the age of eighteen years and would be made to engage in a commercial sex act. *Chapman*, 589 F. App'x at 160.

**B.    A rational trier of fact could not conclude that Snead traveled in interstate commerce or used a facility of interstate commerce with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, or carrying on of a business enterprise involving prostitution.**

To sustain its burden of proof for the crime of use of facility in interstate commerce to promote an unlawful activity as charged in Count IV of the indictment, the Government had to prove beyond a reasonable doubt that Snead "(1) travel[ed] in interstate or foreign commerce or use[d] an interstate or foreign facility, such as the mail; (2) intend[ed] thereby to promote an unlawful activity; and (3) subsequently promote[d] or attempt[ed] to promote

23

that unlawful activity." *United States v. Monu*, 782 F.2d 1209, 1211 (4th Cir. 1986). Pursuant to 18 U.S.C. § 1952(b)(1) the term "unlawful activity" includes prostitution offenses in violation of the laws of the State in which they are committed or of the United States.

> The Government alleged that
>
> beginning on or about December 25th, 2017, to on or about January 24th, 2018, [Snead] knowingly traveled in interstate commerce or knowingly used a facility of interstate commerce; namely, the internet… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, or carrying on of a business enterprise involving prostitution… [which] was illegal under the laws of the State of North Carolina; [a]nd after… using… the internet… [Snead] knowingly deliberately did an act or attempted to do an act, to promote, manage, establish, carry on, or facilitate the promotion, management, or carrying on of a business enterprise involving prostitution.

J.A. at 1075, ¶¶ 13-25; 1076, ¶¶ 1-10.

Snead incorporates his factual summary and Argument I.A., *supra*, herein, as if fully set forth. The Government's evidence failed to show that Snead used a facility of interstate commerce "to promote, manage, establish, carry on, or facilitate the promotion, management, or carrying on of a business enterprise involving prostitution."

**II.    The presentation of irrelevant and prejudicial evidence of unrelated conduct attributed to Snead served to violate his right to due process of law in the manner and conduct of his trial.**

The presentation of irrelevant and prejudicial evidence of unrelated conduct attributed to Snead served to violate his right to due process of law in the manner and conduct of his trial.

*STANDARD OF REVIEW – Plain Error, Joinder*

"A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed.R.Crim.P. 52(b). *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). To establish plain error, an appellant must initially establish: (1) there was error; (2) the error was plain; and (3) the error affected his substantial rights. *Id*. "Even if he establishes each of these three prongs of plain error review," before the Court of Appeals may exercise its discretion to correct the error, it must be convinced that the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Evidence produced at Snead's trial relating to an improperly joined count and other alleged criminal activity seriously affected the fairness of the proceeding against him such that he is entitled to relief under plain error review.

25

"Whether charges are properly joined in an indictment is a question of law that [the Court of Appeals reviews] *de novo.*" *United States v. Cardwell*, 433 F.3d 378, 384–85 (4th Cir.2005). "If the initial joinder was not proper," the Court of Appeals will review the non-constitutional error for harmlessness, "and reverse *unless* the misjoinder resulted in no 'actual prejudice' to the defendant[ ] … because it had [no] substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir.2003) (quoting *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)). If misjoinder is found, the Government bears the burden of demonstrating that any error resulting from the misjoinder was harmless. *Mackins,* 315 F.3d at 412.

Fed.R.Crim.P. 8(a) permits "very broad joinder." *Id.* The requirements of Rule 8(a), however, "are not infinitely elastic, and so 'cannot be stretched to cover offenses ... which are discrete and dissimilar.'" *Id.* (quoting *United States v. Randazzo*, 80 F.3d 623, 627 (1st Cir.1996) and *United States v. Richardson*, 161 F.3d 728, 733 (D.C.Cir.1998)). Joinder of unrelated charges "create[s] the possibility that a defendant will be convicted based on considerations other than the facts of the charged offense." *Cardwell,* 433 F.3d at 385; *see also Bruton v. United States*, 391 U.S. 123, 131 n. 6, 88 S.Ct. 1620, 20

26

L.Ed.2d 476 (1968) ("An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence.").

Joinder of offenses that "are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan presents the opportunity to submit evidence of one offense that ordinarily would be admissible at a separate trial for the other." *United States v. Foutz*, 540 F.2d 733, 737 (4th Cir.1976). However, when offenses are joined based on their same or similar character, "admissibility at separate trials is not so clear." *Id.*

### DISCUSSION

In this case, the joinder of Count I with Counts III and IV served to unduly prejudice Snead's defense on the latter two counts. The evidence that Snead engaged a minor in the production of pornography was based on its similar character, not "based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

McLean, Smith, and Jane herself all testified that Snead and Jane Doe were dating in mid-January 2018, and sexual activity between the pair was not

illicit under North Carolina law. *See* N.C. Gen. Stat. §§ 14-27.23; 14-27.24; 14-27.25; 14-27.28; 14-27.29; 14-27.30; 14-202.1 and 202.2. The private relations between Snead and Jane had nothing to do with an illegal enterprise in which the Government alleged Snead was involved: prostitution.

A substantial portion of the trial and evidence against Snead related to his private conduct with CT, who was an adult, and with Jane, who was not a "child" as the term is defined under North Carolina's criminal statutes. Yet the Government described Snead's conduct as the production of child pornography. J.A. at 492, ¶ 9; ¶¶ 11-12; 493, ¶¶ 11-12. The Government in its opening called Jane Doe a "child who's out of options and had nowhere to go," told the jury the name of the "child," emphasized "she was a child," told the jury Snead was charged with "production of child pornography," told the jury it was immaterial "whether or not that child consents[,]" described "a child who is vulnerable" and then introduced evidence against Snead from a law-enforcement taskforce member "concerning child sexual exploitation" who testified extensively before the jury regarding "child pornography" and "child exploitation." J.A. at 459, ¶¶ 22-23; 460, ¶¶ 8; 13, ¶¶ 20-25; 892, ¶ 4; 633, ¶¶ 7-21; 628-71. Jane Doe described herself as "still a child at that time." J.A. at 695, ¶ 13.

Jane told the jury that she engaged in sexual intercourse with Snead on January 24, 2018, and said they took photographs and made a video of it. J.A. at 686, ¶¶ 5-22; 690, ¶¶ 16-18. Several exhibits depicted Snead and Jane naked together. J.A. at 690, ¶ 5; ¶¶ 8-9. The exhibits depicted Snead's and Jane's bodies "below the belt area." J.A. at 691, ¶¶ 4-11. The Court admitted Exhibit 6, a video showing Snead and Jane engaging in sexual intercourse. J.A. at 691, ¶¶ 19-25; 692, ¶¶ 4-16. The Court admitted substantial testimony from a law-enforcement task member who examined numerous images before the jury, describing several as "child sexual exploitative." J.A. at 933, ¶¶ 9-18.

The evidence was all related to Count I, a count on which the District Court awarded Snead a new trial. The evidence presented against Snead relating to Count I so prejudiced his defense on Counts III and IV that Snead was denied due process of law.

The Government's evidence of Snead's legal sexual relations with Jane had no logical and close connection to the human-trafficking and use-of-a-facility counts. *United States v. Hawkins*, 776 F.3d 200, 207-08 (4th Cir. 2015). Other than Snead's and Jane's identities, "[t]here are no additional factors which indicate the offenses were 'identical or strikingly similar.'" *Id.* at 208.

29

While Snead and Jane engaged in sexual relations on January 24, 2018, on or about the same date deputies investigated escorts at Wilmington's Residence Inn, a mere temporal relationship is not sufficient to show that two crimes were logically related. *United States v. Cardwell*, 433 F.3d 378, 386 (4th Cir.2005).

On balance, under Fed.R.Ev. 403 and 404(b), the probative value of the evidence was substantially outweighed by the danger of unfair prejudice to Snead. *Foutz,* 540 F.2d at 736. "Evidence of 'other crimes' which is relevant only to prove a criminal disposition is universally acknowledged to be inadmissible." *United States v. Holloway*, 1 F.3d 307, 311 (5th Cir.1993).

## STANDARD OF REVIEW, Other Crimes

Snead also presents an argument regarding evidence presented regarding "other crimes" for plain error review.

## DISCUSSION

Fed.R.Ev. Rule 404(a)(1) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

30

Even though Snead was not charged with any drug crimes, the Court admitted substantial evidence regarding Snead's "drug dealing." The admission of this evidence was in error, the error was plain, and the error affected Snead's substantial rights, that is, the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

CT testified that Adam Smith let Snead come and go at Smith's home as long as Snead provided Smith with drugs. J.A. at 549, ¶¶ 20-23. CT said Snead gave her "Molly." J.A. at 571, ¶ 6. Jane Doe said Snead's reputation was that of a drug dealer. J.A. at 636, ¶ 16.  Jane said Snead provided CT with Molly and put Molly in her mouth once while she slept. J.A. at 663, ¶¶ 20-25; 664, ¶¶ 8-16.

McLean said she was in a business relationship with Snead selling Molly. J.A. at 759, ¶ 8, ¶ 13. Smith said he loaned Snead money to buy Molly and let him use his house as a delivery and storage point for drugs. J.A. at 857, ¶¶ 12-15; ¶¶ 24-25. Smith said he had known Snead as a drug dealer for years. J.A. at 852, ¶¶ 7-9; 853, ¶ 2.

To admit against a criminal defendant evidence of other crimes, "[t]he evidence must [first] be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant."

31

*United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997). Second, "[t]he act must be necessary in the sense that it is probative of an essential claim or an element of the offense." *Id.* Third, "[t]he evidence must be reliable." *Id.* Finally, "the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process." *Id.*

The numerous references to Snead's alleged status as "drug dealer" were not relevant to establishing his guilt in the Government's prosecutions. The Government proffered no evidence of *any* connection between Snead's alleged drug dealing and his charges, such that the "drug dealer" evidence was not relevant to whether Snead trafficked a minor in prostitution or used a facility to do so.

The "drug dealer" evidence was highly prejudicial.

Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened.

Advisory Committee's note to Rule 404.

While highly prejudicial, the "drug dealer" evidence was minimally probative of whether Snead trafficked a minor for prostitution or used a facility to do so. It was plain error for the District Court to admit the evidence. *United States v. Lynn*, 856 F.2d 430, 436 (1st Cir. 1988)[6].

Evidence that fails to satisfy the *Queen* test *supra* cannot be rendered admissible simply because the district court provides a limiting instruction. *United States v. McBride*, 676 F.3d 385, 399, N 5 (4th Cir. 2012) ("A jury instruction, while a required condition for the admission of any evidence pursuant to Rule 404(b), does not necessarily rescue the use of otherwise inadmissible evidence."); See *United States v. Johnson*, 617 F.3d 286, 298 (4th Cir. 2010) (finding error "despite the district court's limiting instruction" where "the proponent of Rule 404(b) evidence cannot demonstrate that the evidence satisfies our four-part test for admissibility"). Here, Snead's alleged "drug dealer" status was irrelevant and unduly prejudicial and therefore inadmissible under Rule 404(b) — problems a limiting instruction could not cure. The District Court's erroneous admission of Snead's unrelated criminal activity was not harmless.

---

[6] "Where a party… fails to object to the admission of evidence … [the Court of Appeals reviews] the admission for plain error." *United States v. Chin*, 83 F.3d 83, 87 (4th Cir. 1996) (applying plain error review to an unpreserved challenge to admission of prior bad act evidence under Rule 404(b)).

The District Court allowed the proceeding to become a case about Snead's character as "child exploiter" and "drug dealer," even though he was engaging in legal consensual relations with his girlfriend, and even though his alleged "drug dealer" status had nothing whatsoever to do with crimes for which he stood trial. By admitting the evidence, the District Court "gave rise to the very scenario Rule 404(b) is designed to prevent and deprived [Snead] of his right to be 'tried for *what* he did, not *who* he is.'" *United States v. Hall*, 858 F.3d 254, 288 (4th Cir. 2017) (quoting *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014)).

The admission of unduly prejudicial evidence against Snead which had no probative value of the charges against him, coupled with the joinder of a count the evidence of which painted him as a child pornographer, so poisoned the proceedings against him that Snead was denied fundamental fairness. He is entitled, for the District Court's error in the admission of the evidence described in this argument, a new trial.

III. **The District Court abused its discretion by allowing testimony of an expert witness which was irrelevant and concerned information within the common knowledge of jurors, and which enabled the jury to convict Snead under a statute which is both unconstitutionally vague and overbroad.**

*STANDARD OF REVIEW*

"The district court's decision to admit expert testimony is reviewed for abuse of discretion." *U.S. v. Fuertes*, 805 F.3d 485, 495-96 (4th Cir. 2015).

*DISCUSSION*

The Court abused its discretion in allowing Dr. Sharon Cooper to provide expert testimony as to the culture and background of sex trafficking. The purpose of Dr. Cooper's testimony, rife with generalities such as "very often… very often… typically… very often… the trafficker often will say… they are sometimes run in to by corrupt police… the traffickers typically tell victims… they are often told… This is a very common statement…" was to convince the jury that the tale it had just seen and heard constituted "trafficking." J.A. 951, ¶ 6; J.A. at 955, ¶ 10; 956, ¶ 11; 959, ¶ 13; 963, ¶ 18; 964, ¶¶ 7, 14-15; 965, ¶¶ 19-22.

Dr. Cooper testified about a culture of "pimping" that had nothing to do with Snead. The expert's testimony linked Snead to a culture in which pimps either "maintain control and let the victim know that they cannot leave…

35

through force and violence" or maintain control by use of romance and finesse through promises of a "happy life ever after." J.A. at 946, ¶ 25; 947, ¶¶ 1-8; 960, ¶¶ 12-14. No witness or evidence linked Snead to any violence whatsoever. Much of the romantic conduct between persons Dr. Cooper described—"that of a boyfriend or a husband," or where one sees oneself "as a wife"—is also, between consenting adults, legal. J.A. at 948, ¶¶ 5-16. Snead, legally and consensually the boyfriend of Jane Doe, was yet an "abusive… and also highly manipulative" pimp, as the Government alleged. *Id.* at ¶¶ 17-19. Speaking in generalities, Dr. Cooper told the jury, *inter alia,* Jane was a child who suffered adversities and was groomed into sex trafficking by Snead. J.A. at 951, ¶¶ 6-7. Snead used "romance, to convince the victim that they love them and that we're going to have a life together and this is how it's going to be[.]" J.A. at 960, ¶¶ 5-11. Snead played Jane and CT against each other, prompting them "to see who can bring home the most amount of money and therefore be the highest the best, given the superlative descriptions in that family. Very, very common." J.A. 963, ¶¶ 4-8. The victim (Jane) lied to police and tried to protect Snead because, as Dr. Cooper said, that is "common." J.A. at 964, ¶¶ 24-25; 965. Dr. Cooper gave the jury the Government's opening and closing argument a third time, clothed with the imprimatur of an objective "expert."

Rule 702 of the Federal Rules of Evidence provides that a witness who is qualified as an expert may testify as to one's expert opinion if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702. When the expert testimony is scientific in nature, the District Court must consider whether the evidence "is not only relevant, but reliable." *United States v. Crisp*, 324 F.3d 261, 265 (4th Cir. 2003) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).

Dr. Cooper testified as an expert in general, developmental, behavioral, and forensic pediatrics. J.A. at 944, ¶¶ 11-25; 945, ¶¶ 1-8. She provided extensive testimony regarding sex trafficking culture and the potential long-term effects of sex trafficking on victims. J.A. at 945-969. She admitted that she was not familiar with the details of this case or any alleged victim. J.A. at 970, ¶¶ 8-21. Snead respectfully submits that Dr. Cooper's testimony did not assist the jury in understanding the evidence or in determining a fact in issue. Instead, the testimony served as a theoretical lynchpin used by the Government to criminalize Snead's otherwise legal conduct.

Dr. Cooper has presented nearly identical expert testimony on the culture of sex trafficking in numerous cases, including *United States v. Delgado*, 677 Fed. Appx. 85, 86 (3d Cir. 2017). The *Delgado* Court held that the District Court did not abuse its discretion by excluding "proffered testimony [which] would not help the trier of fact in determining [] guilt as to the offenses charged." *Id.* The Court based its reasoning on opinions from other circuits. *See United States v. Anderson*, 851 F.2d 384, 392 (D.C. Cir. 1988); *United States v. King*, 703 F. Supp. 2d 1063, 1075 (D. Haw. 2010); *United States v. Bostick*, 791 F.3d 127, 151 (D.C. Cir. 2015); *United States v. Amawi*, 695 F.3d 457, 480 (6th Cir. 2012); *United States v. Abdush-Shakur*, 465 F.3d 458, 466-67 (10th Cir. 2006). The Third Circuit held that the kind of generalized testimony Dr. Cooper offers should be excluded if it does not relate to an element of the alleged offense. *United States v. Delgado*, 677 Fed. Appx. at 86.

In this case, Dr. Cooper's testimony had no bearing on any element of the charged offenses. Jane Doe and CT testified in detail about their relationships with Snead. Both undertook relationships with him based on romantic feelings, based on their perception that he could help them make money, and based on other compulsions. At no point was any scientific evidence or medical data presented requiring further explanation to the jury.

38

Instead, Dr. Cooper's testimony was used to convince the jury that as to Snead, a private, consensual relationship was criminal.

Broad expert testimony regarding sex trafficking has been allowed in this circuit, however the cases in which such testimony was allowed have presented factual situations different from this case. For example, the Court of Appeals found no abuse of discretion in allowing an expert in human trafficking to provide broad testimony on a typical human trafficking experience when there was only one victim who testified at trial, and "the jury would have had no way of determining whether the victim's experiences were common, unique, or implausible." *United States v. Warren*, 744 Fed. Appx. 778, 783 (4th Cir. 2019). In this case, two persons testified to similar experiences dating Snead.

CT and Jane described a man with connections sought out by women who thought he could help them make money. At worst, Snead was a failed want-to-be hustler. Even CT, an adult who used Snead as her connection to escort customers, told him: "You a fake hustler, boo." J.A. at 574, ¶ 20.

The Government has traveled far from a statute's initial purpose to criminalize Snead's behavior and send him to prison for, in effect, the rest of his life. Dr. Cooper's testimony was the proverbial icing on the cake, helping

the jury to link private consensual behavior with criminality. Dr. Cooper's words were, in effect, the keys to Snead's prison.

### STANDARD OF REVIEW, *Vagueness*, *Overbreadth*

Snead presents vagueness and overbreadth challenges for plain error review. *United States v. Comer*, 5 F.4th 535, n. 12 (2021).

### DISCUSSION

The expert testimony utilized by the Government was the capstone of a prosecution using a vague and overly broad statute, 18 U.S.C. § 1591, stretched far from its initial purposes to ensnare Snead[7].  Snead respectfully argues that 18 U.S.C. § 1591, on its face and as applied to him in this manner, is unconstitutional for its vagueness and overbreadth. While he challenged the admissibility of Dr. Cooper's testimony, Snead did not raise vagueness and overbreadth arguments in the trial court. However, the Court of Appeals observed in *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 271

---

[7] Dr. Cooper's generalized testimony has been used by the Government in numerous other prosecutions under 18 U.S.C. § 1591, including *United States v. Delgado*, 677 Fed.Appx. 84 (3rd Cir. 2017); *United States v. Williams*, 05-CR-443 (M.D. Pa. Oct. 19, 2007); *United States v. Shamsud-Din*, 10-CR-927 (N.D. Ill. Jan. 31, 2012); *United States v. King*, Cr. No. 09-2007 (D. Haw. March 17, 2010); *United States v. Jennings*, 860 Fed.Appx. 287 (4th Cir. 2021); *United States v. Kidd*, 385 F.Supp.3d 259 (S.D.N.Y. July 1, 2019); *United States v. D'Ambrosio*, 1:15-CR-3 (M.D.Pa. April 7, 2016).

(4th Cir. 2019) that "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." (citing *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)). The Court of Appeals has recognized that when "'deemed necessary to reach the correct result' on matters of public importance, it may '*sua sponte* consider points not presented to the district court *and not even raised on appeal by any party.*'" *Id.* (citing *Wash. Gas Light Co. v. Va. Elec. & Power Co.*, 438 F.2d 248, 251 (4th Cir. 1971) *see also Hormel v. Helvering*, 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941)) (additional citations omitted) (emphasis in original). Snead prays the Court of Appeals address his arguments.

"The void for vagueness doctrine is rooted in the Due Process Clause of the Fifth and Fourteenth Amendments." *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016). "To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 160, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012); *see also Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75

L.Ed.2d 903 (1983) (requiring that criminal statutes contain "minimal guidelines to govern law enforcement."). "The purpose of the fair notice requirement is to enable citizens to conform their conduct to the proscriptions of the law." *City of Chicago v. Morales*, 527 U.S. 41, 58, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939). See *Kolender*, 461 U.S. at 357, 103 S.Ct. 1855. "This test is not applied mechanically," *Manning*, 930 F.3d at 272. "The degree of vagueness tolerated in a law depends in part on the type of statute. Less clarity is required in purely civil statutes because the 'consequences of imprecision are qualitatively less severe.'" *Id.* (citations omitted). "However, if criminal penalties may be imposed for violations of a law, a stricter standard is applied in reviewing the statute for vagueness." *Id.* at 272-73.

In this case, everyone around Snead and Jane Doe said the same thing: they were a couple. The act of sexual intercourse between the two—and any sexual activity between them—was not prohibited by law. A substantial portion of the Government's evidentiary presentation centered around Snead's and Jane's documentation of their lovemaking with a cellular phone

on January 24, 2018. The Government called that "child pornography." The District Court awarded Snead a new trial on the count, but by that time, as far as Snead's defenses on Counts III and IV were concerned, the damage was done. (See Argument II, *supra*).

Snead's adult paramour, quoted above, characterized him as a failed small-time hustler. He may have engaged in braggadocio in text and other messaging applications about his "new hustle," but his bragging did not match up with reality. When Jane was supposed to be "working," Snead was spending the night with her, angering CT to the point that she cut ties with Snead. Snead was far from subjecting either woman to the "degrading institution of slavery [which] continues throughout the world." 22 U.S.C. § 7101(b)(1).

The language of 18 U.S.C. § 1591 is extremely vague[8], yet the penalties for violating it could hardly be more severe. Snead faces essentially the rest of his life in prison for serving as a middleman for two women who wanted to make money performing escort services. That is not the conduct the United States intended to criminalize in 18 U.S.C. § 1591. "A statute is void

---

[8] "[T]he statutory language" in 18 U.S.C. § 1591 "is decidedly broad." *United States v. Thompson*, 896 F.3d 155, 162 (2d Cir. 2018).

for vagueness if it: (1) 'fails to provide a person of ordinary intelligence fair notice of what is prohibited,' or (2) 'is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (quoting *United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008)). The vagueness of the terminology—"recruits, entices, harbors, transports, provides"—and the lack of standards governing enforcement enables the Government to label private, consensual conduct as "sex trafficking" and "to shape [the statute] to fit its litigative strategies[.]" *United States v. Cook*, 782 F.3d 983, 990 (8th Cir. 2015). That is what the Government did in this case, employing Dr. Cooper's testimony to mirror its own views of Snead's words and conduct. J.A. at 459-66; 935-69; 993-1014.

The Government enacted 18 U.S.C. § 1591 as part of the Victims of Trafficking and Violence Protection Act of 2000. (P.L. 106-386, 2000 HR 3244). The act targeted persons involved in "the international sex trade" who use "force, fraud, coercion… [and] [t]he low status of women in many parts of the world… often transport[ing] victims from their home countries to unfamiliar destinations, including foreign countries… leaving victims defenseless and vulnerable." *Id.* at §§ (b)(2)-(5). The act likened the conduct

criminalized to "slavery and involuntary servitude in [the United States before] 1865… Current practices of sexual slavery and trafficking of women and children are similarly abhorrent to the principles upon which the United States was founded." The act sought to eliminate coercion of persons into involuntary sex trade, defining coercion as

> (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of the legal process.

22 U.S.C. § 7102(3).

Premised on a concern that "enforcement of an overbroad law may deter or 'chill' constitutionally protected [First Amendment activity], overbreadth challenges present an exception to the general rule against third-party standing." *United States v. Thompson*, 896 F.3d 155, 162 (2d Cir. 2018) (quoting *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006) and *Virginia v. Hicks*, 539 U.S. 113, 119, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003)). The statute herein violated Snead's own First Amendment associational rights, and "would violate the First Amendment rights of hypothetical third parties if applied to them." *Thompson*, 895 F.3d at 163 (quoting *Farrell*, 449 F.3d at 498). Overbreadth challenges are typically facial challenges. *Id*. In a facial

45

challenge, because "invalidat[ing] *all* enforcement of a challenged law ... is 'strong medicine,'" the challenging party "must demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally," *United States v. Williams*, 553 U.S. 285, 292, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (quoting *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988)). A challenging defendant must demonstrate that the statute is overbroad "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292, 128 S.Ct. 1830.

"The first step in an overbreadth analysis is to 'construe the challenged statute.'" *Williams*, 553 U.S. at 293, 128 S.Ct. 1830. In *Thompson,* the Second Circuit observed that "the statutory language" in 18 U.S.C. § 1591 "is decidedly broad." *Thompson,* 896 F.3d at 166. The *Thompson* defendant "failed to demonstrate that intimate associational rights were substantially burdened in relation to the plainly legitimate sweep of the statute." (citation omitted). The Second Circuit observed that "[t]he statute's legitimate sweep is apparent: it allows conviction of individuals … [who have] forced minors into prostitution and maintained them through varied means." *Id.* at 167.

The evidence in Snead's case shows Snead never forced anyone to do anything. CT wanted to make money and ultimately, when she determined she could make money without Snead, she left him. Jane Doe also viewed Snead as her ticket to money. Both women developed romantic feelings for Snead and engaged in romantic relationships with him. The Government's primary evidence against Snead—his braggadocio—did not match up with the facts.

Snead's prosecution, demonstrates that "a substantial number of instances exist in which the [l]aw cannot be applied constitutionally." *N.Y. State Club Ass'n, Inc.*, 487 U.S. at 14, 108 S.Ct. 2225. As Dr. Cooper testified, with attendant circumstances, a person who promises a mate a "happy life ever after," or who acts as "that of a boyfriend or a husband," or is a party to a relationship in which one sees oneself "as a wife," may really be "the defendant who sees the opportunity" to undertake "subtle forms of trafficking[.]" J.A. at 461, ¶ 25; 466, ¶¶ 2-3; 102, ¶¶ 1-8; 103, ¶¶ 5-16; 115, ¶¶ 12-14. 101, ¶ 25.

Even if the Court declines to invalidate the law in its entirety, Snead respectfully submits that the facts of his case constitute one of the "scenarios [which]… pursued, 'could of course be the subject of an as-applied

47

challenge.'" *Thompson,* 896 F.3d at 168 (quoting *Williams,* 553 U.S. at 302, 128 S.Ct. 1830).

The District Court abused its discretion by admitting Dr. Cooper's testimony, the capstone of a prosecution under a statute that is, facially or as-applied, unconstitutionally vague and overbroad. Snead respectfully requests that the Court of Appeals vacate the judgment and sentence against him.

## IV. The District Court abused its discretion when it ordered Snead to pay $202,743.35 in restitution.

### *STANDARD OF REVIEW*

The Court of Appeals reviews a restitution order for abuse of discretion. *United States v. Steele,* 897 F.3d 606, 609 (4th Cir. 2018).

### *DISCUSSION*

"Because federal courts must rely on statutory authority to order restitution, 'discretion in ordering restitution is circumscribed by the procedural and substantive protections of the statute authorizing restitution.'" *United States v. Ritchie,* 858 F.3d 201, 206 (4th Cir. 2017) (brackets and internal quotation marks omitted). The Court of Appeals reviews any legal issues concerning the interpretation of a restitution statute *de novo.*

*United States v. Ocasio*, 750 F.3d 399, 412 (4th Cir. 2014). The Government must establish an appropriate amount of restitution by a preponderance of the evidence. *Steele*, 897 F.3d at 614 n.5.

Restitution is provided for by the Trafficking Victims Protection Act, 18 U.S.C. § 1593 (2012). The Act provides that a "victim should be compensated for the full amount of losses, which 'has the same meaning as provided in [18 U.S.C. §] 2259(c)(2)[.]'" 18 U.S.C. § 1593(b)(3). "The full amount of losses includes 'medical services relating to physical, psychiatric, or psychological care [and] physical and occupational therapy or rehabilitation,' among other things." 18 U.S.C. §§ 2259(c)(2)(A)–(B). "The amount of restitution need not 'be proven with exactitude.'" *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012). "[D]etermining the dollar amount of a victim's losses attributable to the defendant will often be difficult and such a determination will inevitably involve some degree of approximation, which is not fatal." *Id.* (internal quotation marks omitted). "The District Court should establish the amount of the victim's losses with 'some reasonable certainty.'" *Id.*

At sentencing, Snead objected that the amount of restitution requested by the Government was not supported by the evidence. The amount of

49

restitution sought was speculative. J.A. at 1261, ¶¶ 20-25. The District Court failed to undertake an "individualized assessment" which properly considered the losses 'caused by [Snead's] conduct,' and [the District Court] erred in awarding restitution based on the evidence before the Court. *United States v. Sadler*, 789 Fed.Appx. 952, 955 (4th Cir. 2019); *In re Sealed Case*, 702 F.3d at 59.

"[C]ourts calculating restitution amounts are entitled to rely on any evidence "bearing sufficient indicia of reliability to support its probable accuracy." *United States v. Baston*, 818 F.3d 651, 665 (11th Cir. 2016). In *United States v. Williams*, 319 F.Supp. 812, 817 (E.D. Va. June 8, 2018), Virginia's Eastern District premised restitution calculations on "the minor victims' calculations of their average daily earnings, provided in statements to [agents]… [which] corroborated… evidence introduced over the course of trial." *Williams* featured a substantially larger operation involving more escorts and alleged "pimps," and escort activity occurring over a much longer period, yet Virginia's Eastern District calculated restitution only in the amount of $119,300.00. *Id.* at 816.

In this case, by contrast, the District Court ordered Snead to pay restitution to Jane Doe in the amount of $202,743.35. J.A. at 1271 ¶¶ 18-19.

50

According to the Government's evidence, at most Jane engaged in escort activity for a period of thirteen (13) days, and according to CT, Jane did not even work on the "Jacksonville trip." CT testified to a hodgepodge of figures derived from Ashanti McLean and her extensive experience as an escort. None of the figures discussed exceeded a few hundred dollars, and McLean said she received *none* of the money. The evidence simply did not support the District Court's substantial restitution order. The amount ordered was not "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." 18 U.S.C. §§ 1593(b)(1), (3).

Because the District Court abused its discretion in making the restitution award, Snead requests that the Court of Appeals reverse the award.

**V.    The District Court abused its discretion when it sentenced Snead to serve 420 months on Count III and 60 months on Count IV.**

*STANDARD OF REVIEW*

The Court of Appeals reviews a defendant's sentence "under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007).

*DISCUSSION*

Under the *Gall* standard, a sentence is reviewed for both procedural and substantive reasonableness. *Id.* at 51. In determining procedural reasonableness, the Court of Appeals considers whether the District Court properly calculated the defendant's advisory Sentencing Guidelines range, gave the parties an opportunity to argue for an appropriate sentence, considered the 18 U.S.C. § 3553(a) factors, and sufficiently explained the selected sentence. *Id.* at 49-51. If a sentence is free of "significant procedural error," then the Court of Appeals reviews it for substantive reasonableness, "tak[ing] into account the totality of the circumstances." *Id.* at 51. In the case at hand the District Court failed to demonstrate procedural and substantive reasonableness in rendering Snead's sentence.

52

Snead's sentence is not procedurally reasonable because the District Court failed to properly calculate the Snead's advisory guidelines range. First, the District Court erred in applying a two-level enhancement pursuant to USSG § 2G1.3(b)(2) for unduly influencing a minor, referencing his conviction under 18 USC § 1591(a)(1). This enhancement applies when "a participant otherwise unduly influenced a minor to engage in prohibited sexual conduct." USSG § 2G1.3(b)(2)(B). In determining whether this enhancement applies, a "court should closely consider the facts of the case to determine whether a participant's influence of the minor compromised the voluntariness of the minor's behavior." USSG § 2G1.3 cmt. n.3(B). Additionally, there is a rebuttable presumption that the enhancement applies where the participant is at least ten years older than the minor. *Id.*

In applying the enhancement in the instant case, the District Court focused on Snead's age. J.A. at 1245, ¶ 25; 1246, ¶¶ 1-3. Although he was more than ten years older than Jane Doe, there was no evidence that Snead exerted influence over Jane such that her voluntariness was compromised. J.A. at 1240 ¶¶ 3-7. The Government's evidence showed that Jane undertook the actions attributed to her willingly and voluntarily. The Government presented no evidence that Snead physically or mentally coerced Jane into

53

any acts of prostitution or held her in his company against her will. When Snead first provided Jane with shelter at Smith's home, Jane voluntarily left that shelter and returned to Benson without objection or interference from Snead. J.A. at 632, ¶¶ 18-22; 635, ¶¶ 12-14; 859, ¶¶ 3-5. Snead did not exert undue influence over Jane, and the application of the two-level enhancement pursuant to USSG § 2G1.3(b)(2) was an abuse of discretion.

The District Court also erred in applying a two-level enhancement pursuant to USSG § 3C1.1. This enhancement applies where a defendant is found to have

> willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . ..

USSG § 3C1.1.

In applying the enhancement in this case, the District Court relied upon Jane Doe's testimony about sworn affidavits she signed under oath, which she said were false and obtained under pressure from Snead's mother. J.A. at 1247, ¶¶ 20-25; 1248, ¶¶ 1-12. The District Court also referenced an intercepted jail phone call between Snead and his mother in which the two

54

discuss Jane's affidavit. J.A. at 1248, ¶¶ 1-5. At trial, Jane identified the voices in the audio as belonging to Snead and his mother. J.A. at 749, ¶¶ 16-25; 750, ¶¶ 1-18. However, on cross-examination, Jane admitted that the person Snead and his mother were discussing in the conversation was actually *Snead's sister*, not Jane Doe. J.A. at 751, ¶¶ 10-21. Thus, the Government failed to prove that Snead attempted to obstruct justice. Therefore, the application of the two-level enhancement pursuant to USSG § 3C1.1 was an abuse of discretion.

Finally, the District Court erred in applying a five-level enhancement pursuant to USSG § 4B1.5(b)(1). This enhancement applies when a defendant is convicted of a sex crime, which includes an offense under 18 U.S.C. § 1591, and "engaged in a pattern of activity involving prohibited sexual conduct." USSG § 4B1.5(b). A defendant "engaged in a pattern of activity involving prohibited sexual conduct if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." USSG § 4B1.5 cmt. N.4(B). "Prohibited sexual conduct" includes a violation of 18 USC § 1591. 18 USC § 2426(b)(1)(A); USSG § 4B1.5 cmt. n.4(A).

Snead had no prior history of convictions for sexual offenses. J.A. at 1248, ¶¶ 24-25; 1249, ¶¶ 1-2. Additionally, as argued by Snead's trial counsel,

55

Snead was granted a new trial for his conviction under 18 USC § 2251. J.A. at 1240, ¶¶ 17-18. Thus, the trial court's basis for applying the enhancement under USSG § 4B1.5(b)(1) were Jane Doe's escorting dates. As discussed above in Snead's factual summary and Arguments, the Government failed to prove that Snead (1) knowingly recruited, transported, harbored, maintained, obtained, or enticed a person; (2) in or affecting interstate commerce; (3) knowing or in reckless disregard of the fact that the victim had not attained the age of eighteen years and would be made to engage in a commercial sex act. Therefore, the application of the five-level enhancement pursuant to USSG § 4B1.5(b)(1) was an abuse of discretion.

Because his sentence was not procedurally reasonable, the Court of Appeals need not consider the substantive reasonableness of Snead's sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007). However, should the Court of Appeals find that Snead's sentence is procedurally reasonable, it must assess the substantive reasonableness of the sentence. *Id*. A "presumption of reasonableness" is applied to sentences "within or below a properly calculated guidelines range." *United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017). This "presumption can only be rebutted by showing that the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a)

factors." *Id.* at 357-58 (internal quotation marks omitted). The "sentencing court must place on the record an individualized assessment based on the particular facts of the case before it." *United States v. Lynn*, 592 F.3d 572, 576 (4th Cir. 2010) (internal quotation marks omitted).

Here the advisory guidelines range, based upon the offense level calculated by the District Court, for Snead's case was a sentence of life incarceration. J.A. at 1251, ¶¶ 8-17. Because Snead's sentence is below the guidelines range, an examination of whether the District Court properly considered the § 3553(a) factors is required. *Vinson*, at 357. During Snead's sentencing, the Court said it considered the § 3553(a) factors in connection with the facts of Snead's case, but declined to mention each factor individually. J.A. at 1262, ¶¶ 12-14, 23-24. Although the sentencing judge "need not robotically tick through the § 3553(a) factors," *United States v. Helton*, 782 F.3d 148, 153 (4th Cir. 2015) (internal quotation marks omitted), one must "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority." *United States v. Blue*, 877 F.3d 513, 518 (4th Cir. 2017) (internal quotation marks omitted).

In the District Court's consideration of the factors herein, the Court only passingly mentioned the factors which would warrant a lower sentence of incarceration for Snead and instead dwelled on its own opinions of the type of person it thinks Snead is. The District Court failed to give a thoroughly reasoned basis for imposing such a "serious sentence." J.A. at 1262, ¶¶ 3-25; 1263-1267, ¶¶ 1-12. The Court's summary consideration of the factors is not within the goals of § 3553(a) of imposing a sentence that is "sufficient, but not greater than necessary" and thus could not be said to be substantively reasonable. *United States v. Smith*, 472 F.3d 222, 224 (4th Cir. 2006).

The District Court abused its discretion in imposing a procedurally and substantively unreasonable sentence. Snead respectfully requests that the Court of Appeals vacate the sentence and order resentencing.

## CONCLUSION

Appellant Marvarlus Snead respectfully requests that, based on the foregoing, the Court vacate the judgment and sentence rendered against him, dismiss the case or, in the alternative, hold that error was committed in Appellant's trial warranting reversal, remand, and the award of a new trial. Mr. Snead respectfully requests oral argument.

RESPECTFULLY SUBMITTED for the Appellant, Marvarlus Snead, this the 21st day of December 2021.

/s/Paul A. Tharp
Paul A. Tharp
Attorney for Appellant
N.C. Bar No. 34244
ARNOLD & SMITH, PLLC
200 North McDowell Street
Charlotte, North Carolina 28204
Telephone:      704.370.2828
Facsimile:      704.370.2202
pat@arnoldsmithlaw.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with type-volume limits because, excluding

the parts of the document exempted by Fed. R. App. P. 32(f) (cover

page, disclosure statement, table of contents, table of citations,

statement regarding oral argument, signature block, certificates of

counsel, addendum, attachments):

   this document contains 12,856 words.

2.     This document complies with the typeface requirements because:

   This document has been prepared in a proportional spaced

   typeface using Microsoft Word in 14 point Book Antiqua.

Dated: December 21, 2021

*/s/Paul A. Tharp*
Paul A. Tharp
Attorney for Appellant
N.C. Bar No. 34244
ARNOLD & SMITH, PLLC
200 North McDowell Street
Charlotte, North Carolina 28204
Telephone:       704.370.2828
Facsimile:        704.370.2202
pat@arnoldsmithlaw.com

*Counsel for Appellant*